OPINION OF THE COURT
Wesley, J.
During the course of this medical malpractice trial, the court rejected on hearsay grounds plaintiffs attempt to introduce the Physicians’ Desk Reference (PDR) into evidence to establish by itself the standard of care for a doctor in prescribing and monitoring a drug. We hold that the PDR as offered here constitutes hearsay and cannot, by itself, establish the applicable standard of care for physicians who prescribe medications for their patients.
Roberta Spensieri began taking birth control pills in 1978. In early 1986, she began experiencing irregular menstrual bleeding. In May of that same year, Spensieri was examined by defendant Dr. John H. Streit and was prescribed Ortho-Novum 10/11, a birth control pill containing estrogen. The following month she was examined by defendant Dr. Charles W. Lasky. Lasky noted that although Spensieri was taking an oral contraceptive, she was still experiencing irregular heavy bleeding with clots. After a physical examination, Lasky made a diagnosis of dysfunctional uterine bleeding. He sought to increase Spensieri’s estrogen level to help stop the bleeding and instructed her to take her birth control pill four times a day for five days and, thereafter, once per day.
According to the PDR, oral contraceptives such as Ortho-Novum carry with them a risk of thromboembolism leading to strokes. The PDR notes that patients often discontinue use of oral contraceptives when they experience irregular vaginal *235 bleeding. Furthermore, the PDR warns that changing to an oral contraceptive with a higher estrogen content may increase the risk of thromboembolic disease.
Spensieri’s bleeding and clotting reappeared in September 1986. Spensieri telephoned Lasky who, without seeing her, prescribed the estrogen Estinyl. The drug package insert for Estinyl notes that the dangers of estrogen include abnormal clotting leading to stroke, heart attack or pulmonary embolus. The package insert further warns that while on estrogen, a person should be alert for “signs of trouble,” including abnormal vaginal bleeding.
Within a month of taking Estinyl, Spensieri, then 29 years old, suffered a severe stroke rendering her quadriplegic and unable to speak. She commenced this medical malpractice action alleging, among other things, that defendants “in prescribing [Ortho-Novum and Estinyl] failed to timely and adequately monitor and examine [her] and otherwise were negligent in her care, treatment and management.”
At trial, Spensieri sought to introduce “product information” excerpts from the PDR. Her medical expert characterized the information as authoritative concerning the use and administration of drugs and further testified that manufacturers, by law, must provide this information to the Food and Drug Administration (FDA). He specifically noted that the PDR was a standard of care for physicians relative to the use and administration of Ortho-Novum in 1986. Spensieri then offered into evidence those portions of the PDR pertaining to Ortho-Novum. The court sustained defendants’ objection on hearsay grounds.
Spensieri’s expert then described the risks associated with birth control pills containing estrogen, including the significance of “thromboembolic problems,” such as myocardial infarction, heart attack and stroke. The doctor opined that the standard of care requires physicians to understand the risks associated with the use of any medication. Moreover, the acceptable standard of care requires the physician to do more than just prescribe birth control pills to address a problem of abnormal bleeding.
Defendants and their expert testified that the PDR is a source of information on prescription drugs, but is not authoritative as a standard of care. Lasky also maintained that he understood all the risks associated with estrogen and birth control pills. He further testified that the use of oral contracep *236 tives as a means to control abnormal bleeding is not a deviation from the standard of care.
At the close of testimony, Spensieri requested the court to charge the jury that New York requires doctors to have knowledge of the risks and benefits of the drugs they prescribe and that this requirement includes the expectation that doctors will avail themselves of all the drug manufacturer’s recommendations. Spensieri’s proposed jury charge also included a statement that estrogen is regulated by the FDA and that doctors should know the contraindications or risks contained in the patient package inserts. The trial court rejected plaintiffs request.
Spensieri then sought to modify the traditional medical malpractice instruction found in the New York Pattern Jury Instructions (PJI 2:150) to include a paragraph stating that in the State of New York, the standard of care requires doctors to have knowledge of the drug that they are prescribing. The trial court did not modify the jury charge. The court summarized the factual contentions of the parties concerning the use and monitoring of birth control pills and estrogen to control plaintiffs condition and also instructed the jury that the standard of care for Lasky and Streit is measured by “the degree of knowledge and ability of the average Board certified obstetrician/gynecologist in good standing practicing that specialty in the State of New York.”
The jury returned a verdict for defendants. Spensieri’s motion to set aside the verdict or, in the alternative, for a new trial, was denied.
The Appellate Division affirmed, holding that PDR excerpts were hearsay and thus, as offered, were properly excluded. The Appellate Division further concluded that the trial court’s refusal to give the requested jury charge on prescription medication was not reversible error. The court noted that the jury charge reviewed the parties’ factual assertions and instructed the jury on the relevant principles of medical malpractice in substantial conformance with the New York Pattern Jury Instructions. We granted plaintiffs motion for leave to appeal and now affirm.
Spensieri acknowledges that the PDR excerpts are hearsay; they were offered to prove the truth of the warnings in the PDR concerning Ortho-Novum (see, Prince, Richardson on Evidence § 7-313 [Farrell 11th ed] [“Scientific books or reports are excluded as hearsay when offered as proof of the facts asserted *237 in them.”]). She maintains, however, that the warnings and contraindications contained in the PDR should have been admitted into evidence because the PDR is a reliable tool generally recognized by doctors as a standard of care to which they must adhere in prescribing and monitoring medications. The question remains whether the PDR by itself can constitute evidence of the physician’s standard of care.
The PDR is an encyclopedia of medications, written and compiled by drug manufacturers, that is published annually (Martin v Hacker, 83 NY2d 1, 9). Along with the drug manufacturer’s package insert, the PDR is a means for drug manufacturers to make physicians aware of possible side effects of the drug in question (id,.). The information contained in the PDR and package insert must comply with the FDA’s guidelines for the proper labeling of prescription drugs (id.; see also, Comment, Package Inserts for Prescription Drugs as Evidence in Medical Malpractice Suits [Package Inserts], 44 U Chi L Rev 398 [1977]).*
Although this Court has never determined whether the PDR is evidence of a physician’s standard of care, some courts have approved the use of the PDR for this purpose. Some have characterized this information as prima facie evidence of a standard of care (see, Ohligschlager v Proctor Community Hosp., 55 Ill 2d 411, 303 NE2d 392; Mulder v Parke Davis & Co., 288 Minn 332, 181 NW2d 882). Others allow the statements contained in the PDR only as some evidence that the fact finder may consider along with expert testimony on the standard of care (see, Morlino v Medical Ctr., 152 NJ 563, 706 A2d 721; Craft v Peebles, 78 Haw 287, 893 P2d 138; Ramon v Farr, 770 P2d 131 [Utah]).
The “Mulder rule” enunciated by the Minnesota Supreme Court provides that:
“Where a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the *238 dangers which are inherent in its use, a doctor’s deviation from such recommendations is prima facie evidence of negligence if there is competent medical testimony that his patient’s injury or death resulted from the doctor’s failure to adhere to the recommendations” (Mulder v Parke Davis & Co., supra, 288 Minn, at 339-340, 181 NW2d, at 887).
Two Appellate Division Departments appear to have adopted the Mulder rule (Gatto v Cooper, 201 AD2d 455 [2d Dept]; Paul v Boschenstein, 105 AD2d 248 [2d Dept]; Armstrong v State of New York, 214 AD2d 812 [3d Dept], Iv denied 86 NY2d 702). Plaintiff urges that we do the same.
Generally, the standard of care for a physician is one established by the profession itself (Toth v Community Hosp., 22 NY2d 255, 262, rearg denied 22 NY2d 973). A physician will usually be insulated from tort liability where there is evidence that he or she conformed to accepted community standards of practice.
Drug manufacturers compose the information found in the PDR to comport with FDA regulations, to serve advertising needs, to provide necessary information to a doctor and to limit their liability (Morlino v Medical Ctr., supra, 152 NJ 563, 580, 706 A2d 721, 729; Martin v Hacker, supra, 83 NY2d 1, 8-10; see also, Comment, Package Inserts, op. cit., 44 U Chi L Rev 398, 424). The purposes behind the PDR render its content ill-suited to serve as prima facie evidence of a standard of care (Comment, Package Inserts, op. cit, at 416); they seek to cover a wide range of concerns not always directed at a diagnosis and course of treatment.
In the jurisdictions that have rejected the Mulder approach, expert testimony is required to explain the contents of the PDR since the information is not easily understood by a lay jury that has no medical training; drug manufacturers write PDR entries for the medical profession not the general public (Morlino v Medical Ctr., supra, 152 NJ 563, 580, 706 A2d 721, 729-730; Craft v Peebles, supra, 78 Haw 287, 300, n 17, 893 P2d 138, 151, n 17; see also, Comment, Package Inserts, op. cit., 44 U Chi L Rev 398, 425). Moreover, the admission of the PDR alone in place of expert testimony would result in a standard of care established by drug manufacturers instead of the medical profession (Morlino v Medical Ctr., supra, 152 NJ 563, 581, 706 A2d 721, 730; cf., Toth v Community Hosp., 22 NY2d 255, 262, supra) and would prevent parties from being able to adequately cross-examine this type of evidence submitted on the standard of care.
*239 Thus, we reject the contention that the PDR constitutes prima facie evidence of a standard of care. The PDR may have some significance in identifying a doctor’s standard of care in the administration and use of prescription drugs, but is not the sole determinant. In our view, the information contained in the PDR can only be analyzed in the context of the medical condition of the patient. The testimony of an expert is necessary to interpret whether the drug in question presented an unacceptable risk for the patient in either its administration or the monitoring of its use.
In this case plaintiffs expert testified that in his opinion the PDR represented the standard of care for physicians in the use and administration of prescription drugs in 1986. In addition, he described the risks of prescribing the drugs in question in light of plaintiffs medical condition. Thus, plaintiff was not prohibited from offering testimony concerning her expert’s professional evaluation of defendants’ conduct based, in part, on reliance on the PDR. Plaintiff was barred only from offering the contents of the PDR as stand alone proof of the standard of care (see, Prince, op. cit., § 7-313; see also, Gunnarson v State of New York, 95 AD2d 797).
Plaintiff also argues that this Court has implicitly created a basis for the admission of the PDR when it enunciated the learned intermediary doctrine in Martin v Hacker (supra, 83 NY2d 1). The learned intermediary doctrine focuses on the scope of a drug manufacturer’s duty to warn of the dangers of using the drug in question. That duty is fulfilled by giving adequate warning to the prescribing physician (id., at 9). The physician must then balance the risks and benefits of various drugs and treatments and act as an “informed intermediary” between manufacturer and patient (id.). When the PDR is admitted in this context, it is admitted solely to establish the existence of a warning, and its adequacy, to a physician. Under the learned intermediary doctrine, the fact finder evaluates the warning contained in the PDR or package insert for its accuracy, clarity and relative consistency (id., at 11). The warning is not offered for the truth of its contents. Thus, the learned intermediary doctrine does not create a new hearsay exception for the use of the PDR to establish a standard of care in medical malpractice trials.
Finally, plaintiff also contends that the trial court erred by refusing to modify the jury charge to include a physician’s duty in prescribing and monitoring prescription drugs. The charge here substantially conforms with the Pattern Jury Instructions *240 (PJI 2:150) and states the relevant principles of medical malpractice (see, Green v Downs, 27 NY2d 205, 208). We agree with the Appellate Division that the trial court supplemented the charge by accurately identifying the factual assertions of the parties with regard to the prescription and monitoring of the drugs in question. Thus, the charge in this case was appropriately given.
Plaintiffs remaining arguments are without merit.
Accordingly, the order of the Appellate Division should be affirmed, without costs.

 The package insert information for most drugs is reprinted in the PDR (Comment, Package Inserts, op. cit., 44 U Chi L Rev 398, at n 2). Although plaintiff only sought admission of the PDR entries on Ortho-Novum in this case, we see no substantive difference between PDR entries and drug package inserts. Thus, any reference to the PDR correspondingly applies to the drug package insert.