OPINION OF THE COURT
Walter J. Relihan, Jr., J.
This is a motion in limine. Plaintiff, at trial, will seek to prove that a ski lift injury sustained on January 24, 1997 resulted in an injury to the left femur, chronic pain and a per *274 manent partial disability. Defendant ski operator will contest that causal connection.
Since January 1997 plaintiff has been treated by no less than five physicians and surgeons and has undergone three surgeries. However, none of these treating doctors will be called by the plaintiff to give testimony and none have been deposed. Instead, plaintiff proposes to call a single medical expert witness, an orthopod, who saw the plaintiff only once on February 18, 2002, five years after the injury. The expert, Dr. Maloney, has read the written evaluations of Doctors Anderson, Racker, Garner, Damron and Weiner and is prepared to testify to the findings, diagnoses, operative procedures, results and prognoses found in the notes and written reports of these treating doctors.
Dr. Anderson, an orthopaedic specialist, first saw plaintiff in February 1997. Maloney reports that the Anderson notes describe the plaintiff’s complaints and make an initial diagnosis of a nondisplaced fracture of the acetabulum but an X ray, Maloney states, did not detect any evidence of the fracture. Plaintiff continued to have low-grade pain. She was treated by Dr. Racker who administered multiple injections which, Maloney reports, “did not give her significant relief.”
Plaintiff returned to Dr. Anderson about 10 months later. Maloney states that Anderson recommended that she see a Dr. Garner, a pain management specialist. “Their impression,” Maloney states, was a “left SI joint and dysfunction secondary to the trauma sustained January 24, 1997.” Since “she did not respond,” Dr. Garner sent her for a bone scan which was performed in March 1998 and found a “lytic lesion in the proximal femur.”
Anderson, Maloney states, then sent her to Dr. Damron, an orthopaedic oncologist, who had bone scans and a CT scan performed. Maloney reports that Damron “states that he has seen micro stress fractures felt to be the cause of pain with fibrous dysplasia.” It is not clear, from this report, that the reference is to the plaintiff or other patients he has seen. In May 1998 Damron incised the lesion, performed a curettage and bone grafting and installed a locking gamma nail to stabilize the femur. Maloney reports that she continued to have pain and was referred to a pain center in New York City. In July 1998, Maloney reports, plaintiff saw Damron again who, Maloney says, concurred in the decision to have her receive trigger point injections for persistent pain.
Then, Maloney reports, she sought treatment from Dr. Weiner, also in New York City. The Weiner records, Maloney *275 says, mentioned that his work-up included a bone scan and CT scan leading to the conclusion “that a surgical procedure would be needed to repair and revise her fixation for the * * * fracture.” The second surgery was performed in May 1999 “for revision of failed fixation.” Weiner notes that the cross screw was bent. Maloney writes that this “would be indicative of hardware failure with concomitant fracture of the femur as documented in Dr. Weiner’s notes.” The operation again noted fibrous tissue in the area of the femur lesion. Am iliac crest bone graft was used to pack the lesion defect and the hardware was replaced. In April 2001, the new hardware was removed to relieve the plaintiffs discomfort and she continued with her rehabilitation efforts.
Evidence regarding all of these extended medical facts and conclusions must come from Dr. Maloney. Having reviewed his opinion letter to plaintiffs counsel, it is abundantly clear that his conclusions will be heavily, if not totally, dependent upon the notes and records of the treating doctors. We have no doubt that he is a qualified orthopaedic surgeon but he is not a treating physician. He was retained by counsel for plaintiff, on the eve of trial, for the single purpose of reviewing the notes and records of others in order to give opinion testimony regarding the nature and extent of the plaintiffs injury, the likely cause of that injury, and the many medical and surgical interventions which followed.
We assume that the notes and records routinely kept by the treating doctors in the course of their practice will be produced and identified at trial and will be authenticated by a witness with personal knowledge of such record keeping matters. Certified hospital records, presumably, will also be produced. Business entries of this kind are admissible in evidence for the truth of the matters asserted in such records. (CPLR 2306, 4518 [c]; 4532-a; Wilson v Bodian, 130 AD2d 221.)
Assuming that no such foundation is laid, however, a much different issue may arise. The Court of Appeals, in People v Stone (35 NY2d 69) and People v Sugden (35 NY2d 453), relaxed the rule which required that an expert witness must render an opinion based only upon facts personally known by the witness or facts supported by evidence in the trial record. Dr. Maloney, of course, has no personal knowledge of the treatment rendered to plaintiff by the other doctors whose records he reviewed. Absent a proper foundation, the other records would not be in evidence.
The enlarged rule, in Stone and Sugden (supra), permits the expert, in addition to facts in evidence, to “rely on material, *276 albeit of out-of-court origin, if it is of a kind accepted in the profession as reliable in forming a professional opinion” (35 NY2d at 460). This open door was narrowed, however, in Hambsch v New York City Tr. Auth. (63 NY2d 723), which added an important caveat. The proponent must produce evidence that the hearsay record or statement is reliable. “It is not enough merely to * * * show that other experts rely on the same type of materials in forming similar opinions” (Martin, Capra and Rossi, New York Evidence Handbook § 7.3.3, at 676). Moreover, it has been held that the out-of-court material relied upon by the expert, however reliable, must not be the “principal basis” for an opinion on the ultimate issue in the case, rather than merely forming a link in the chain of data which led the expert to the opinion (Borden v Brady, 92 AD2d 983). That issue, we gather, is whether the fall from the ski lift caused a fracture which, in turn, awakened the latent femoral lesion, thus causing the chronic pain and permanent partial disability of the left leg.
More fundamentally, the courts of New York have been reluctant to permit any but a treating physician to rely upon the “accepted or reliable” exception to the rule against hearsay. The reason is plain. The exception, in respect to medical opinions, is grounded upon the universal understanding that doctors make life and death decisions in reliance upon “information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records and X-rays.” (Fed Rules Evid rule 703, 1972 Advisory Comm Notes.) Information of this kind, by its nature, is inherently reliable. Where the out-of-court information is not used for the purpose of treatment, by a doctor who has the actual care of the patient, there is no such assurance of reliability.
“A report used only for testimony obviously lacks the guarantees of reliability found in a report actually relied upon for treatment decisions affecting a patient’s health.
“Not surprisingly, therefore, the case law consistently holds that a non-treating expert may not testify based on the report of another physician, where the report is not independently admitted and the other physician is not a witness at trial.” (Friedman, Need for a Testifying Physician To Rely on Reports by a Non-Testifying Physician Poses Evidentiary Problems, 73 NY St BJ 9, 28-29 [Nov./Dec. 2001].)
Where a treating doctor refers a patient to a consulting doctor for evaluation and the resulting report is used by the refer *277 ring doctor in order to treat the patient, the reliability of the report is evident. Here, the out-of-court materials were generated by a series of treating doctors but were not used by the testifying doctor to treat the patient. Hence, it is not the reliability of the out-of-court materials that gives pause but the use to which these records and reports will be put by the testifying but nontreating expert.
Dr. Maloney’s report to plaintiffs counsel appears to have winnowed through what may be a great mass of material from a series of reports by treating doctors. His report quotes or paraphrases isolated comments, observations and conclusions from those reports to generate an opinion on some of the ultimate issues in the case. These include the causal connection between the fall at the ski lift and the fracture and the course of subsequent chronic pain treatment and surgical interventions. The opinion connects the injury to the fall and finds that this is the injury which has resulted in a permanent partial disability. Maloney also implicitly opines that the hardware implant, installed by one of the treating surgeons, did not cause an additional bone fracture of the femur as the result of malpractice.
Justice Friedman notes, in her New York State Bar Journal article (supra at 28) that: “the reliability of the out-of-court material is not the only factor the courts must consider in determining the permissible basis for an expert opinion. The interest of the opposing party in confronting witnesses on crucial issues in the case must also be taken into account. A compelling argument may be made that this interest is unfairly overlooked by an evidentiary rule that would permit even a treating doctor either to base an opinion about a crucial issue * * * primarily upon another doctor’s report, or to testify about the contents of the other doctor’s report when the other doctor is not subject to cross examination.”
This issue, as Justice Friedman points out, has not been expressly discussed in prior opinions but “may explain why the Borden v Brady majority opinion remains good law” (id.). Even assuming the Borden minority view ultimately prevails, which would permit an expert opinion on the ultimate issue, the circumstances of the case at bar strongly suggest that the People v Sugden exception is not broad enough to permit Dr. Maloney to express an opinion based upon selected excerpts from the records accumulated over several years by treating doctors, none of whom will be called to testify at trial and none of whom have been deposed under oath. The defendant’s confrontation *278 interests are squarely implicated when the complete and authenticated records of the treating doctors are not offered and received in evidence and a nontreating expert is permitted to render opinions based upon selected excerpts.
Concededly, authority may be found to condone the use of unadmitted X rays and similar out-of-court test results by a nontreating expert witness (Pegg v Shahin, 237 AD2d 271; Karayianakis v L & E Grommery, 141 AD2d 610). However, these opinions emphasize that the out-of-court materials merely served to confirm the conclusions drawn by the testifying expert based upon the expert’s independent examination and findings. Notably, the unadmitted reports involved objective test results which, presumably, were available to defendants and could not be easily misrepresented. Here, Dr. Maloney may be used as a mere conduit by which to funnel out-of-court material into evidence, much of it dealing with nonobjective diagnostic and prognostic impressions of considerable subtlety. His selective characterizations of these materials may suggest conclusions not intended by the authors. Under these circumstances, the plaintiff will have failed to establish an adequate basis for the admission of opinion testimony based on these out-of-court materials (Erosa v Rinaldi, 270 AD2d 384, 385).
An exception broad enough to accommodate Dr. Maloney’s opinion evidence would transform our adversary system into what has been described as “trial by dossier.” The reluctance of our courts to permit that trend is seen in Brown v County of Albany (271 AD2d 819, lv denied 95 NY2d 767), in which the defendant’s right to cross-examine the doctor whose records were admitted in evidence, but who did not appear at trial, seems to have been a paramount factor in excluding such material.
Dr. Maloney’s expert testimony, therefore, must be limited to his own physical examination and any diagnosis/prognosis he may be able to form based upon his own findings. He may rely upon certified out-of-court X rays, bone scan or MRI reports providing such objective test results are used as part of the data and information he employed to reach his own opinion. He may not rely upon the out-of-court records, opinions or impressions of treating doctors which are not admitted in evidence under an independent exception to the rule against hearsay. These materials, we emphasize, were not used by Dr. Maloney for purposes of treatment but only for the purpose of developing opinion evidence to be used in support of plaintiffs personal injury litigation.
*279 Dr. Maloney should be advised, with care, regarding the ruling of the court in order to prevent unnecessary disputation, and inadvertent prejudicial testimony, in the presence of the jury. A number of other issues, posed by the motion and cross motion in limine, were resolved informally in the course of an extended hearing.