[791 NYS2d 221]

Timothy J. Hinlicky, as Administrator of the Estate of Marie M. Hinlicky, Deceased, and as Executor of William P. Hinlicky, Deceased, Appellant, v David C. Dreyfuss et al., Respondents.

Third Department, March 17, 2005

## APPEARANCES OF COUNSEL

*Powers & Santola L.L.P.*, Albany (*Michael J. Hutter* of counsel), for appellant.

*Aswad & Ingraham*, Binghamton (*Charles O. Ingraham* of counsel), for David C. Dreyfuss, respondent.

*Phelan, Phelan & Danek L.L.P.*, Albany (*John J. Phelan* of counsel), for Robert O. Frank, respondent.

*Sugarman Law Firm*, Syracuse (*Timothy J. Perry* of counsel), for Riverside Associates in Anesthesia, P.C., respondent.

## OPINION OF THE COURT

PETERS, J.

Marie M. Hinlicky (hereinafter decedent) suffered a heart attack soon after a carotid endarterectomy operation which she underwent for removal of plaque buildup in her carotid artery. She died 25 days later. In this medical malpractice action, plaintiff, decedent's son, as administrator of decedent's estate and as executor of the estate of William P. Hinlicky, decedent's husband,[1] alleges, as here relevant, that defendant Robert O. Frank, decedent's treating internist who recommended the surgery, defendant David C. Dreyfuss, the surgeon who performed the surgery, Gregory Illioff, the anesthesiologist at the surgery, and defendant Riverside Associates in Anesthesia, P.C., the group with whom Illioff was affiliated were negligent.

Frank began treating decedent for high blood pressure in 1984. He referred her to Dreyfuss, a board-certified general and vascular surgeon, in 1996, after she reported chest pains on her left side. Testing revealed a mild carotid blockage on the right side, with 70 to 75% blockage on the left side. Dreyfuss recommended that decedent undergo surgery to remove the blockages. The gravamen of this action focused upon the propriety of allowing the surgery to proceed without having first conducted a cardiac evaluation.

At trial, plaintiff elicited the testimony of Frank, who explained how he came to the determination that decedent be referred for a vascular surgery evaluation. Dreyfuss thereafter detailed the evaluation that he performed to determine the

---

1. William Hinlicky was a named plaintiff in this action but he died during the course of litigation. Plaintiff was thereafter substituted as executor of his estate.

degree of decedent's coronary artery disease, testifying exten- sively regarding the manner in which he arrived at his decision to schedule decedent for surgery and how he ultimately concluded that further invasive tests were not required. Plaintiff also elicited the testimony of Illioff to review his preoperative anesthesia assessment.

Illioff testified that he evaluated decedent on the basis of her medical records, a physical examination and the history she provided. From such information, Illioff testified about the numerous other factors that he would consider to determine the need for a further cardiac evaluation prior to performing surgery. After being questioned about decedent's specific health history, Illioff opined that decedent's clinical predictors did not indicate the necessity for a cardiac evaluation. On cross- examination, he iterated his preoperative assessments. He was then questioned about the existence of any guidelines which he would utilize to determine whether further cardiac testing of decedent was necessary. Illioff responded that in 1996, the Amer- ican College of Cardiology (hereinafter ACC), in conjunction with the American Heart Association (hereinafter AHA), published an article entitled ''ACC/AHA Guideline Update on Perioperative Cardiovascular Evaluation for Noncardiac Surgery'' which contained a flow diagram, or an algorithm, and a table, entitled ''Cardiac Risk Stratification of Noncardiac Sur- gical Procedures,'' which were used by physicians to evaluate a patient's preoperative need for a cardiac evaluation. Illioff testi- fied that he incorporated this algorithm into his practice shortly after its publication and that he had been using these guidelines ever since. Based upon this testimony, defense counsel sought to introduce the algorithm and table into evidence. Plaintiff's counsel objected, contending that both the chart and the table were hearsay which did not fall within a recognized hearsay exception. Illioff explained that the algorithm was commonly used by not only anesthesiologists, but also surgeons, internists, family physicians and other doctors doing preoperative medical evaluations to determine whether their patients required fur- ther cardiac evaluation. He opined that the algorithm would be helpful to explain to the jury the steps that he undertook to reach his conclusion. Based upon his testimony, Supreme Court allowed the admission of the algorithm and table into evidence by finding that they fell within the ''professional reliability'' exception to the hearsay rule and that their use was ''merely one link in the chain of which [Illioff] relied upon to reach a

conclusion." Illioff then used the algorithm to show the jury the evaluative procedure he undertook before concluding that decedent did not require further testing.

By the conclusion of the trial, 10 physicians had testified. Nine were either treating physicians defending their care or were experts testifying on various aspects of the case. Not one of those nine physicians criticized the algorithm or gave any reason why it would not be useful. Also admitted during the trial, over objection, was a flow chart created by the Cayuga Medical Center which was based upon the algorithm; the physician who developed that chart testified at trial and described its use as a tool to its physicians.

Plaintiff maintained, throughout the trial, that due to decedent's history and clinical presentation, which the algorithm did not take into account, the treating physicians should not have relied upon it. The defense maintained that the algorithm took decedent's risk factors into account and that it supported their independent judgment not to refer her to a cardiologist before surgery. The jury found in favor of defendants and plaintiff appeals.[2]

The sole contention on appeal is whether the admission of the algorithm and table, along with the chart formulated by the Cayuga Medical Center, was error. In our view, the algorithm was not being offered for the truth of the matter asserted therein, but was instead being offered to illustrate the stepwise decision-making process which Illioff applied before proceeding with decedent's surgery. Illioff testified, at length, as to the specific information he considered before the algorithm was offered and then applied the finite sequence of steps in the algorithm to demonstrate the logic behind decedent's care. As they were offered not to establish a per se standard of care but for the nonhearsay purpose of illustrating a physician's decision-making methodology, Supreme Court properly allowed their admission.

The Court of Appeals has permitted the introduction of such materials if used for a limited nonhearsay purpose (see Spensieri v Lasky, 94 NY2d 231 [1999]). In Spensieri, the challenged admission pertained to the Physicians' Desk Reference (hereinafter PDR) and whether it could be used as per se evidence of a standard of care for physicians regarding their use and

---

**2.** The three judgments rendered individually in favor of each defendant have been consolidated for the purpose of appeal by an order of this Court.

administration of a particular oral contraceptive. The Court of Appeals concluded as follows:

> "The PDR may have some significance in identifying a doctor's standard of care in the administration and use of prescription drugs, but is not the sole determinant. . . . The testimony of an expert is necessary to interpret whether the drug in question presented an unacceptable risk for the patient in either its administration or the monitoring of its use" (*id.* at 239).

Hence, *Spensieri* did not preclude testimony concerning an expert's professional evaluation of a physician's conduct based upon his partial reliance on the PDR (*id.* at 239); such expert was only barred from offering the contents of the PDR "as stand alone proof of the standard of care" (*id.* at 239). Accordingly, so long as the medical reference materials are reliable, they will be admissible if used to explain a physician's decision-making process and not proffered as per se evidence of a standard of care (*see generally Liuni v Haubert*, 289 AD2d 729, 730 [2001]; *Flah's, Inc. v Rosette Elec.*, 155 AD2d 772, 773 [1989]). Here, there was no dispute that the algorithm was a reliable, if not universally accepted, approach to a cardiac risk stratification evaluative process; even plaintiff's cardiology expert openly "embrace[d] the[ ] guidelines."

Thus, Supreme Court properly concluded that the algorithm was a "link in the chain of data" (*Borden v Brady*, 92 AD2d 983, 984 [1983]) which led Illioff to his medical conclusions. It "merely served to confirm the conclusions drawn by the testifying expert based upon the expert's independent examination and findings" (*Hornbrook v Peak Resorts*, 194 Misc 2d 273, 278 [2002]).[3]

With no objections to defense counsel's summation or Supreme Court's instructions regarding the jury's use of these contested materials, any contentions raised with respect to those portions of the trial are not preserved for review.

CARDONA, P.J., CREW III, SPAIN and CARPINELLO, JJ., concur.

Ordered that the judgments are affirmed, with one bill of costs.

------

**3.** Our analysis regarding the algorithm is equally applicable to the chart designed by the Cayuga Medical Center.