IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

DOCTORS COMPANY, INSURER,
FOR ITSELF AND FOR ANNABELL
TORRES, M.D.,

     Appellants,

 v.                                                                    Case No.  5D15-1963

NANCY PLUMMER, INDIVIDUALLY
AND AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF WILLIAM PLUMMER,
AND ON BEHALF OF B.A.P. AND L.J.P.,
MINORS,

     Appellee.

_____/

Opinion filed January 20, 2017

Appeal from the Circuit Court
for Volusia County,
Sandra C. Upchurch, Judge.

Thomas E. Dukes, III and Philip F. Moring,
of McEwan, Martinez, & Dukes, P.A.,
Orlando, and Mark Hicks and Dinah Stein,
of Hicks, Porter, Ebenfield & Stein, P.A.,
Miami, for Appellants.

Bryan S. Gowdy and Jessie L. Harrell, of
Creed & Gowdy, P.A., Jacksonville, and
Carlos Diez-Arguelles, Maria D. Tejedor,
and Jack T. Cook, of Diez-Arguelles &
Tejedor, P.A., Orlando, for Appellee.

EVANDER, J.

Appellants Annabell Torres M.D. ("Dr. Torres") and her malpractice insurer, Doctors Company, appeal a final judgment entered pursuant to a jury verdict in this wrongful death medical malpractice case. Judgment was entered in favor of Appellee, Nancy Plummer, individually, and as personal representative of the estate of William Plummer ("Decedent"). Because Appellee was permitted to present prejudicial, undisclosed expert testimony and because of certain erroneous evidentiary rulings, we are compelled to reverse and remand for a new trial.

On December 4, 2009, Decedent visited the Valentine Family Clinic in DeLand, Florida, complaining of ear pain that had persisted for two weeks. Decedent was seen by Dr. Lee Brown, who diagnosed a bilateral otitis media (a middle ear infection) and "sinusitis chronic with obstruction." Dr. Brown wrote two prescriptions for Z-Pak antibiotics, and told Decedent to follow-up in two weeks. On December 18, 2009, Decedent returned to the Valentine Family Clinic and was seen by Dr. Torres, a board certified family physician. According to Dr. Torres' notes, Decedent complained of chronic ear problems that persisted for one month. During this visit, Decedent's chart failed to reflect that any ear exam took place. Although not reflected in Decedent's chart, Dr. Torres later testified that it "usually would be within my standard to check into the ears." Dr. Torres recommended that Decedent take a Medrol Dosepak, a steroid, to aid Decedent's mild sinusitis. Additionally, Dr. Torres provided Decedent with samples of Levaquin, an antibiotic, given that the Christmas holiday was approaching and as a precaution in case Decedent's sinusitis worsened over that period of time. At the bottom of the chart, Dr. Torres' notes reflected instructions that Decedent follow-up in one month.

2

Decedent returned to the Valentine Family Clinic on February 25, 2010, when he complained of "intense right ear pain." Dr. Torres examined Decedent's ear and found a bulging tympanic membrane (ear drum). Dr. Torres diagnosed Decedent with right-ear otitis media once again. Upon her exam, Dr. Torres noted no redness of the ear, no pus in Decedent's ear canal, nor discharge from the ear. Dr. Torres prescribed Decedent another Z-pak and pain medication. Dr. Torres did not refer Decedent to an ear, nose, and throat doctor for further consultation.

The next morning, on February 26, 2010, Decedent visited Atlantic Ear Nose & Throat, where he was seen by a physician assistant. Decedent complained of a four-month history of a clogged right ear with muffled hearing. The physician assistant noted Decedent had pus in the right ear, fluid behind his eardrum, as well as redness of the eardrum, and diagnosed Decedent with a middle and outer ear infection. The physician assistant advised Decedent to finish the current Z-pak and Medrol Dospak, and prescribed Ciprodex with an instruction to follow-up in ten days. The physician assistant did not note any signs of sinusitis.

Early the next morning, on February 27, 2010, Decedent collapsed at his home and was taken to Florida Hospital in DeLand. A CT scan of Decedent's brain was ordered, and revealed "effacement of the cerebral hemispheric sulci as well as the basilar cisterns, concerning for cerebral edema." The CT final report also noted: "Bone detail shows opacification of the right mastoid sinus and right middle ear" and bilateral ethmoid sinus disease (sinusitis). Following Decedent's admission to the hospital, Dr. Daniel Rothbaum, a physician with Atlantic Ear Nose & Throat, surgically placed a tube in Decedent's ear to

3

relieve fluid buildup in the ear. Dr. Rothbaum later recalled his belief that Decedent's ear infection had progressed to an infection of the brain, stating:

> This was a patient who, from what I could gather, had had problems with an ear infection and had progressed to what appeared to be an infection of the brain. And so as part of that treatment for that, I thought it was important to try to maximally treat the ear infection, even if I couldn't treat what was going on in the brain. And so to do that, I decided to try to drain any infection from behind the eardrum. The type of infection we're talking here is one that's in what's called the middle ear, the area between the eardrum and the inner ear.

While completing the surgery, Dr. Rothbaum observed that Decedent's eardrum was "a little bit red and that there was fluid behind the eardrum." Dr. Rothbaum did not recall seeing pus behind the eardrum or an abscess. During the surgery, a culture of the fluid found in Decedent's ear was taken and revealed strep pneumonia, a bacteria likely resistant to Z-Pak antibiotics. Following the procedure, Dr. Rothbaum diagnosed Decedent with Eustachian tube dysfunction, acute otitis media (middle ear infection) with meningitis/sepsis, and cerebral edema.

Subsequent to his hospital admission, Decedent stopped breathing and was placed on a ventilator. He ultimately passed away on March 2, 2010. The cause of death was meningitis.

In her initial complaint filed November 8, 2012, Appellee alleged that Dr. Torres breached her duty of care to Decedent by:

> a. Negligently obtaining history from [Decedent];
>
> b. Negligently failing to recognize the signs and symptoms of serious head and neck disease including acute and chronic, potentially fulminant otitis media and sinusitis with extension to the meninges and brain, bacterial meningitis and/or other brain infection;

4

c. Negligently failing to include the diagnosis of bacterial meningitis in the differential diagnosis;

d. Negligently failing to STAT refer [Decedent] to the hospital Emergency Department for complete laboratory evaluation including pan-cultures, CBC, sedimentation rate, imaging studies of the head and neck;

e. Negligently failing to obtain a STAT ENT consult and complete neurological evaluation to rule out serious life threatening disease;

f. Negligently ordering a Z-pak after [Decedent] presented with months of an ear infection and history of using a Z-pak in the past which did not resolve his symptomology.

Notably, the initial complaint did not allege that Dr. Torres was negligent in giving Levaquin samples to Decedent.

Appellee's primary standard of care experts were Dr. Finley Brown, a family medicine expert, and Dr. Jerrold Dreyer, an infectious disease expert. Their deposition testimony supported the proposition that Dr. Torres breached her duty of care at the December 18, 2009 visit by: (a) misdiagnosing Decedent's condition; (b) failing to take a complete history from Decedent; (c) failing to perform a proper physical exam of Decedent; (d) failing to culture Decedent's ears to determine the type of germ he had; (e) failing to treat his ear infection; (f) failing to perform bloodwork; (g) failing to order imaging studies; and (h) failing to send Decedent to an ENT or the emergency room. Significantly, neither retained expert testified that Dr. Torres had breached her duty of care by providing Levaquin samples to Decedent. Indeed, when asked about Dr. Torres' decision to provide Decedent with Levaquin samples during the December 18, 2009, visit, Dr. Dreyer testified in his deposition that he did not believe her action was inappropriate.

As to the February 25, 2010, visit, Appellee's experts opined that Dr. Torres breached her duty of care in:  (a) failing to do a culture; (b) failing to order lab work and imaging studies; (c) failing to refer Decedent to the emergency room; and (d) prescribing drugs that had already been proven ineffective for Decedent.

In September 2014, after the depositions of Dr. Brown and Dr. Dreyer had been taken, Appellee moved to amend the complaint.  The asserted basis of the motion to amend was to ensure that a jury instruction would be given as to comparative negligence:

> The Defendants have pled comparative negligence in this case.  They recently withdrew their motion to withdraw their defense.  The evidence in this case suggests that the [Decedent] was comparatively negligent.
>
> WHEREFORE, the Plaintiff respectfully requests this court to amend the pleadings and/or to amend the pleadings to conform the evidence and provide a specific jury instruction on comparative negligence.

However, the amended complaint also set forth two additional alleged breaches of Dr. Torres' duty of care.  Specifically, the amended complaint alleged that Dr. Torres had "[n]egligently failed to record and keep appropriate records," and had "[n]egligently prescribed medications, such as steroids, which were contraindicated given [Decedent's] presentation."

The case proceeded to trial in April 2015.  Prior to trial, Appellee failed to disclose to Dr. Torres' counsel her intent to present evidence that Dr. Torres' decision to provide Levaquin to Decedent constituted a breach of her duty of care.  Indeed, shortly before trial, Appellee filed a motion in limine to preclude Dr. Torres from presenting any evidence that Levaquin would have cured or eliminated the infection discovered during the

6

December 18, 2009, visit. Appellee argued in her motion that the introduction of such evidence would constitute prejudicial, undisclosed expert testimony:

1. **As a threshold matter, not a single witness or expert witness has rendered the opinion, or testified in their deposition that the Levaquin samples provided to WILLIAM PLUMMER on December 18, 2009, cured, eradicated, "killed" or otherwise eliminated the infection that was present on December 18, 2009. It would be improper and highly prejudicial for any witness to introduce this opinion *now* as it cannot be supported by the available facts. As Defendant's experts have not rendered this opinion, doing such at trial would constitute a new opinion, and therefore, would be prohibited under *Binger v. King Pest Control*, 401 So. 2d 1310 (Fla. 1980) [sic] and its progeny.**

   . . . .

3. Defendant, Defendant's experts, and Defendant's counsel have already indicated that they intend to advance a defense that Mr. PLUMMER's infection on Feburary 25, 2010 (which resulted in his death), was an "acute" infection, and not the same infection Mr. PLUMMER had on December 18, 2009. Plaintiff anticipates that Defendant, Defendant's experts and/or Defendant's attorneys will attempt to support this theory by opinion, commenting, inferring and/or otherwise suggesting that Dr. TORRES' administration of Levaquin samples on December 18, 2009 resulted in eradication and/or elimination of the infection that was present on that date.

During Appellee's opening statement, Appellee's counsel advised the jury that Levaquin was not an FDA-approved drug for the treatment of ear infection and that Dr. Torres should not have given samples of the drug to Decedent:

> But Levaquin is not an FDA approved drug for the treatment of ear infections. So she gives him the wrong drug. And then she gives him the wrong amount and the wrong dose. Because a reasonably careful and prudent doctor documents how much a patient is supposed to take, how

7

often, for how long and how many milligrams. And give the patient the instructions and you document that in the record.

Because you do that so you know whether you gave the right amount, the right dose and the right amount that's clinically indicated that the manufacturer tells you, this is what you need to give so that you can kill the bug.

If you give too little, you're not going to kill it. If you give too much, you may make the patient resistant. She doesn't document the dose, the administration, or how much.

Dr. Torres timely objected and argued that there had been no pretrial expert testimony regarding Levaquin and testimony regarding same would constitute an "unfair surprise" and "a new opinion." Dr. Torres' counsel further moved for a mistrial. After the trial court overruled Dr. Torres' objection and denied her motion for mistrial, Appellee's counsel went on to advise the jury that Dr. Torres failed to follow the manufacturer's instructions when she gave Decedent the Levaquin.

So the package insert for Levaquin calls that you got the culture before you give the drug. And the reason for that is because it's a strong drug. It's got a lot of risk associated with it.

And it also says that you need to culture because you need to see if it's the right drug for streptococcus. Because there are many different types of streptococcus and they don't know if it's fine on Levaquin.

The manufacturer says you first culture, and then it will take a day or two to get the results. And when you get the results back, you adjust accordingly.

So the manufacturer – culture first, don't give the antibiotic unless you culture first. Because if you give the antibiotic and you culture it next, that can give you a false negative.

So you culture first, give – you can give the patient antibiotics for a day or two and you get the cultures back in a day or two and susceptibility testing, you look at it, you say, is

it the right antibiotic? Great. Keep them on it. If it's not, the manufacturer says you've got to adjust.

The defendant in this case didn't follow the manufacturer's instruction when she gave the Levaquin, and because she gave the Levaquin without doing that, it was the wrong drug. And because it was the wrong drug, it didn't do anything for the ear infection.

Consistent with counsel's opening statement, and over Dr. Torres' continued objection, Appellee's two standard of care experts testified that Dr. Torres breached her duty by providing Decedent with Levaquin.

Dr. Finley Brown explained that Levaquin became a generic drug in 2005, and that the FDA/manufacturer's instructions on Levaquin do not indicate that it was intended for the treatment of otitis media or a middle ear infection. He further opined that a family practice physician would have the obligation to refer to, and know about, a prescription drug's package insert prior to administering that medication. Dr. Brown stated that Levaquin's package insert mentions obtaining a culture prior to prescribing the drug in order to determine whether an infection is bacterial.

According to the insert, culture and sensitivity testing were needed prior to prescribing Levaquin as a way to "reduce the development of drug-resistant bacteria and maintain the effectiveness of Levaquin and other antibacterial drugs." Dr. Brown opined that the package insert's language set the standard for the use of Levaquin and that no cultures or sensitivities were completed on the December 18, 2009, visit. When asked if there was a deviation from the standard of care and a deviation from accepted practice when Dr. Torres provided Decedent with Levaquin samples without taking a culture and susceptibility test, Dr. Brown answered in the affirmative.

9

Dr. Dreyer similarly testified that the standard of care requires a physician to be familiar with the package insert for any medication he or she prescribes. Pursuant to the insert's language, Levaquin is not an FDA-approved drug for the treatment of otitis media or ear infections. According to Dr. Dreyer, the insert prescribed the proper dosage of Levaquin needed to treat sinusitis; however, Dr. Torres did not document the dosage she provided to Decedent or how long he was supposed to take the prescription. Such failures, according to Dr. Dreyer, constituted a breach of the standard of care. Dr. Dryer likewise confirmed that the Levaquin package insert recommended that a culture of the infection be performed prior to a physician prescribing the drug.

In closing argument, Appellee's counsel again emphasized Dr. Torres' use of Levaquin and the Levaquin package insert:

> Why do we know it's important to take a culture? Because we saw from the manufacturer's package insert on Levaquin it's not FDA approved for ear infections, but the manufacturer says this is a strong antibiotic. And if you're going to use this antibiotic, physicians need to culture.
>
> Why do they need to culture? Because culturing will tell you what the bug is. And when you know what the bug is, you can give the right antibiotic because you can't be giving antibiotics willy-nilly because patients develop a resistance to it.

On appeal, Dr. Torres argues that she was unduly prejudiced by Appellee's argument and evidence regarding Levaquin. We agree and conclude that the trial court erred in permitting Appellee to argue and present evidence that Dr. Torres breached her duty of care by providing Levaquin samples to Decedent and further erred by allowing the Levaquin package insert to be admitted into evidence.

In *Binger v. King Pest Control*, 401 So. 2d 1310 (Fla. 1981), the Florida Supreme Court established a test that trial courts should employ when determining whether certain undisclosed testimony should be excluded as prejudicial to the opposing party:

> [A] trial court can properly exclude the testimony of a witness whose name has not been disclosed in accordance with a pretrial order. The discretion to do so must not be exercised blindly, however, and should be guided largely by a determination as to whether the use of the undisclosed witness will prejudice the objecting party. Prejudice in this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: (i) the objecting party's ability to cure the prejudice, or similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case . . . . If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.

*Id.* (footnotes omitted). The *Binger* analysis has subsequently been applied to cases where an expert changes his or her opinion or gives a new opinion, which results in surprise and prejudice to the opposing party. *See, e.g.*, *Perryman, M.D. v. Crawford*, 968 So. 2d 83, 85-86 (Fla. 4th DCA 2007) ("We find it no stretch to conclude that the failure to disclose an expert witness's opinion in compliance with a pretrial order and a proper discovery request should be analyzed under the principles announced in *Binger* and is 'tantamount to permitting an undisclosed adverse witness to testify.'").

Here, the record reflects that Dr. Torres was prejudiced by the surprise testimony and evidence presented at trial regarding Levaquin. Appellee first disclosed its intent to present evidence that Dr. Torres' provision of Levaquin samples to Decedent constituted

11

a breach of a duty of care during counsel's opening statement at trial. As a result, Dr. Torres was denied the opportunity to conduct discovery on whether Decedent actually used the Levaquin and, if so, the amount used, and whether such use would have adversely affected Decedent. Additionally, Dr. Torres was denied the opportunity to discover whether the package insert introduced at trial was authentic. Indeed, Dr. Brown stated that the Levaquin given by Dr. Torres was manufactured by Johnson and Johnson, yet the package insert shown to the jury was from manufacturer Janssen Ortho, LLC. Furthermore, although Dr. Torres testified that she gave the Levaquin to treat sinusitis rather than an ear infection, her experts were deprived of the opportunity to fully respond to the claim that Levaquin samples should not have been provided to Decedent.[1]

The trial court's error was compounded by permitting the insert to be admitted into evidence (even assuming its authenticity). Although section 90.706, Florida Statutes (2014), permits statements of facts or opinion on a subject of specialized knowledge contained in a learned treatise, pamphlet, or other writing to be used in cross-examination of an expert witness, it does not permit those statements to be used as substantive evidence. *Nationwide Mut. Fire Ins. Co. v. Darragh*, 95 So. 3d 897, 901 (Fla. 5th DCA 2012). The rationale for this rule is, otherwise, an opposing party would be deprived of the opportunity to cross-examine or impeach the source of the statement of fact or opinion. *Id.*[2]

---

[1] It should be noted that a juror specifically posed a question for Dr. Dreyer on the use of Levaquin: "If Levaquin is not for use in the treatment of ear infections, why does the doctor think that Dr. Torres, the ENT and the hospital gave or attempted to give [Decedent] Levaquin?"

[2] Of course, the fact that the insert itself might not be admissible into evidence would not preclude an expert from discussing same if facts or data in the insert were "of

Other courts have concluded that although a prescription drug package insert may have some significance in identifying a doctor's standard of care in the administration and use of a prescription drug, it cannot be used as "stand-alone proof" of the standard of care. *See In re Richardson-Merrell, Inc. Bendectin Prods. Liab. Litig.*, 624 F. Supp. 1212, 1232 (S.D. Ohio 1985) (holding that drug manufacturer's warnings are out-of-court statements offered to prove the truth of the matter asserted, therefore inadmissible hearsay); *Spensieri v. Lasky*, 723 N.E.2d 544, 548 (N.Y. 1999) ("The [Physicians' Desk Reference] may have some significance in identifying a doctor's standard of care in the administration and use of prescription drugs, but is not the sole determinant. . . . The testimony of an expert is necessary to interpret whether the drug in question presented an unacceptable risk of the patient in either its administration or the monitoring of its use."); *Saccone v. Gross*, 84 A.D.3d 1208, 1209 (N.Y. App. Div. 2011) (holding that plaintiff was properly precluded from offering information from package insert as republished in Physicians' Desk Reference into evidence because the proffered evidence constituted inadmissible hearsay).

We also hold that the trial court reversibly erred in excluding the deposition testimony of Dr. Kelley, the emergency room physician who treated Decedent when he arrived at the hospital on February 27, 2010. Dr. Kelley made certain observations of the patient that arguably supported Dr. Torres' theory of defense. In excluding Dr. Kelley's deposition, the trial court initially observed that the witness had not been subpoenaed. When Dr. Torres' counsel appropriately argued that Florida Rule of Civil Procedure

---

a type reasonably relied upon by experts in the subject to support the opinion expressed." *See* § 90.704, Fla. Stat. (2014).

1.330(a)(3)(F) expressly authorizes the use of a deposition by any party for any purpose if the court finds that the witness is an expert or a skilled witness, the trial court inexplicably declined to find Dr. Kelley was a skilled witness.

The trial court erred in declining to find Dr. Kelley was a skilled witness, particularly where it was uncontroverted that Dr. Kelley was a licensed and experienced emergency room physician, who was board certified in emergency medicine. As a result, it was error for the trial court to preclude Dr. Torres' use of Dr. Kelley's deposition. *See, e.g.*, *Castaneda v. Redlands Christian Migrant Ass'n,* 884 So. 2d 1087, 1093 (Fla. 4th DCA 2004) (holding that it was error of law for trial court to refuse to permit party to use depositions of opposing party's employees where use was expressly authorized by Florida Rule of Civil Procedure 1.330). We reject Appellee's suggestion that the exclusion of Dr. Kelley's deposition was harmless. Although Dr. Kelley's records were admitted into evidence, the jury was denied the opportunity to hear her qualifications and any statements made in her deposition that amplified and/or clarified the contents of her records.

We reject, without discussion, Appellants' other issues raised on appeal.

REVERSED and REMANDED for new trial.

PALMER and BERGER, JJ., concur.