**Anne BERRY, individually and in her Capacities as Surviving Spouse of Howard Scott Berry, and as Administratrix of the Estate of Howard Scott Berry, Deceased; Marion Wilcox; Michael Berry; and Howard Scott Berry, Jr.; Plaintiffs,**

v.

**CARDIOLOGY CONSULTANTS, P.A.; a Delaware corporation; Andrew Doorey, M.D.; Defendants.**

**C.A. No.: 04C–10–102 SCD.**

Superior Court of Delaware, New Castle County.

Submitted: Aug. 14, 2006.
Decided: Oct. 31, 2006.

---

Ben T. Castle, Esquire, and Natalie Wolf, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, attorneys for the plaintiffs.

Bradley J. Goewert, Esquire, and Lorenza A. Wolhar, Esquire, Marshall, Dennehy, Warner, Coleman & Goggin, Wilmington, Delaware, attorneys for the defendants.

DEL PESCO, J.

After a jury verdict in favor of the defendants, cardiologist Andrew Doorey, M.D. ("Dr. Doorey"), and his employer, Cardiology Consultants, P.A., in this medical negligence case, the plaintiffs filed a motion for post-trial relief. They present two arguments. First, that the Court erred in admitting into evidence an algorithm offered through a defense expert witness. Second, that the verdict was against the weight of the evidence. I conclude that the algorithm was properly admitted, and the evidence—while hotly contested—supports a defense verdict.

### FACTS

Howard Scott Berry Sr. ("Mr. Berry" or "decedent") had been a patient of the defendant, Dr. Doorey, for twelve years prior to his death. Dr. Doorey's care of the decedent began when he had an acute heart attack in April, 1990. Mr. Berry was forty-eight years old at the time. Af-

ter his admission, he had a second heart attack involving a different area of his heart. At that time, it was discovered that one of his vessels had a 100% blockage which was not cured by angioplasty.

Mr. Berry had another heart attack fourteen months later, in June 1991, involving a different area of the heart. The treatment after that episode was a blood thinner, Coumadin, for life. In 1996, another blockage occurred in a different artery. That was treated with a stent. Over the ensuing years, decedent developed diabetes, high blood pressure, and high cholesterol, all risk factors for heart disease.

In November 2002, a catheterization was performed because of symptoms reported to the cardiologist. The test revealed that the decedent had "triple vessel disease" which required immediate bypass surgery on November 21, 2002. The record reflects that in spite of the surgery, some portions of the decedent's heart were not revascularized.

The events which underpin this litigation occurred at about midnight on November 23, 2002. At that time, Mr. Berry experienced an episode of atrial fibrillation which resulted in the administration of Amiodarone under the direction of surgical staff. That decision was reviewed by Dr. Doorey the next day, after a further incident of atrial fibrillation.[1] Eventually there were three recurrences of atrial fibrillation over the next couple of days. The danger associated with atrial fibrillation is a stroke. Administration of the Amiodarone continued beyond the time of decedent's discharge on November 27, 2002.

Mr. Berry and his wife appeared for a scheduled post-operative appointment with Dr. Doorey on December 9, 2002. He was given a prescription for Amiodarone, which was never filled. Dr. Doorey testified that he explained the appropriate dosage going forward, including a reduction in the medication to commence after a month, and dictated those instructions in a letter to Mr. Berry's treating physician while he and his wife were present.

Mr. Berry returned to the hospital some fifty days later, on February 1, 2003. He had pulmonary complaints. A different cardiologist, Dr. Ashish B. Parikh, noted in the medical record: "[t]here is no sign of Amiodarone toxicity at this point ... I hear the "Velcro" sound in the lungs. Therefore, I believe that this may be suggestive of early Amiodarone effect."[2] Erring on the side of caution, Dr. Parikh directed Mr. Berry to terminate the use of Amiodarone, and discharged him, with a referral to Dr. Gerald M. O'Brien, a pulmonologist.

Mr. Berry returned to the hospital on February 6, 2003, with pulmonary complaints. A pulmonary biopsy was performed. He was discharged on February 24, 2003. The specimens were sent to the hospital's pathology department. The pathologist sought a second opinion from a physician at Harvard Medical School, Eugene J. Mark, M.D. Dr. Mark's letter opinion is incorporated in the hospital's record. It states, *inter alia*, that it is a "difficult case," and he "prefers the diagnosis of Amiodarone pneumonitis." He also mentions Lipitor pneumonitis as "less well established."[3] Mr. Berry was discharged

---

**1.** Dr. Doorey testified that Mr. Berry had three recurrences of atrial fibrillation. References to Dr. Doorey's trial testimony on direct examination will be cited as "Doorey Direct at ___." Doorey Direct at 64.

**2.** Plaintiffs' Exhibit 1.

**3.** Plaintiffs' Exhibit 2.

again. He was again admitted on March 4, 2003, and died on March 23, 2003. The certificate of death says that the immediate cause of death was Acute Pneumonitis, and Amiodarone Toxicity.

## PLAINTIFFS' THEORY OF LIABILITY

### Use of Amiodarone

The plaintiffs' theory of the case was that Amiodarone should not have been prescribed. This argument is based on the fact that the Physicians Desk Reference ("PDR") indicates that Amiodarone was approved for ventricular tachycardia, not atrial fibrillation.[4]

### Dosage

At trial, plaintiffs' principal argument was that the amount of Amiodarone administered to Mr. Berry was more than double what would be permitted by the standard of care. In support of that argument, the plaintiffs produced expert testimony, as well as evidence that the hospital had a Cardiac Surgery Service Manual ("CSSM") which contained an algorithm[5] for post cardiac surgery atrial fibrillation. The CSSM algorithm provides that when there is post cardiac surgery atrial fibrillation, the appropriate dosage of Amiodarone is 400 mg TID for 5–7 days then 200 mg a day. The amount administered to Mr. Berry was greater than that indicated in the CSSM algorithm. The algorithm was admitted in evidence as Plaintiff's Exhibit 5 and relied upon by plaintiffs as the

standard of care for the administration of Amiodarone.[6]

Plaintiffs' theory was supported by two experts. Dr. H. Brandis Marsh testified that Amiodarone was an appropriate drug for the treatment of atrial fibrillation, but that the amount of medication administered was excessive. Dr. Robert M. Stark testified that Amiodarone was an inappropriate medication for atrial fibrillation, and he concurred that the amount was excessive and prescribed for too long.

Plaintiffs raised an issue as to the clarity of the communications to Mr. Berry regarding the dosage to be taken, arguing that the dosage on the prescription was different than what Dr. Doorey testified the decedent was to take.

### Informed Consent

Plaintiffs argue that the decedent was not informed regarding the risks associated with the usage of Amiodarone, particularly the risks of pulmonary damage. The argument is that Mr. Berry was a compliant, cautious man who would have sought more information before taking Amiodarone, and, had he known of the pulmonary risk, he would have reacted differently to the onset of symptoms.

## DEFENDANTS' EVIDENCE

### Use of Amiodarone

Defendants agreed that the PDR reflects usage of Amiodarone for ventricular arrhythmia. Defense experts explained that Amiodarone was approved for ventricular arrhythmia in 1985. Subsequent to

---

**4.** This theory of liability was abandoned by plaintiff in closing. References to plaintiffs' closing argument and rebuttal argument will be cited as "Plaintiffs' Closing at ___." Plaintiffs' closing at 4, 22.

**5.** The chart is not labeled algorithm, I attach that name as an algorithm is defined as "[a] systematic process consisting of an ordered

sequence of steps, each step depending on the outcome of the previous one. In clinical medicine, a step-by-step protocol for management of a health care problem...." Stedman's Medical Dictionary 45 (27th ed.2000).

**6.** Plaintiffs' Closing at 24.

that time and after the drug was off patent protection, it began to be used for other purposes, known as "off list usage." Because there was no financial incentive to go through the process of FDA approval for a different usage, the PDR does not reflect that expansion in the usage of the drug. In addition to Dr. Doorey, one of plaintiffs' experts and both of the defense experts testified that Amiodarone is well accepted and widely used for the treatment of atrial fibrillation.

### Dosage

The CSSM algorithm states a dosage less than that prescribed by Dr. Doorey for Mr. Berry for atrial fibrillation. Dr. Doorey explained that when a patient has cardiac surgery, the patient is under the care of the cardiac surgeon, not the cardiologist. While the cardiologist and other specialists may be consulted on problems, only the surgeon has the ability to issue orders. During the time that the surgeons are off, or unavailable, there are numerous hospital employees including nurses, physician's assistants, and others, who are involved 24/7 in the care of patients. In order to have a prompt response to a problem arising when the surgeon is not available, the cardiac surgeons prepare guidelines for the treatment of certain conditions. Those guidelines eg. The CSSM algorithm, are designed to enable the support team to get something started at a time when a specialist is not available. The guidelines are not provided to cardiologists such as Dr. Doorey, and do not set a standard to which the specialist is bound.

### Creation of Guidelines for treatment of Atrial Fibrillation

Defendants presented testimony primarily through the testimony of Eric N. Prystowsky, M.D., about the unusual circumstances related to the establishment of a dosage regimen for Amiodarone. Dr. Prystowsky testified that a specific dosage of Amiodarone has not been established.[7]

7. References to Dr. Prystowsky's trial testimony will be cited as "Prystowsky at ___." Prystowsky at 16–18.

What typically happens is the drug gets developed in animal models, then goes to clinical testing, goes to phase one. Normal volunteers. They give the drug. They decide what's called pharmocokinetics; how much dose do you need to get? What is the half life? How long is it in the body? It goes through this whole very rigorous drug development process.

That's how you get a dosing scheme. How is it that the doctor knows when a new drug comes out to give two twice a day? What I tell you is what someone else is telling me. I haven't done the research of some drug for pneumonia or something, someone else has. The guidance we get is based on all this arduous process that companies are forced to go through; not so Amiodarone. Now you have a scenario where there are literally hundreds of investigators ... publishing papers, trying to figure it all out, everyone is using different regimens. No one made up their minds, and I was invited to Washington, DC with a lot of other people who are very involved, FDA involved, and, frankly, around 1985 the FDA did something they have never done before in our area and never done since, they approved the drug without any formal testing.

They realized they simply couldn't deal with this anymore, better to at least approve it, and they put a big black box around it, they restricted its use, frankly scared it was going to be, once it was approved, anyone could get it, that people were going to abuse it, had a lot of down sides. It had a huge upside advantage; it was often the only drug that would work to save someone's life. So they were stuck. So from the very beginning, no one, still today, no one has agreed on what is the typical dose of this drug. No one knows the minimal effective dose. No one knows what the legitimate blood level should be, although many of us have published on it.

. . . .

What happened was when we finally wrote the guidelines to reflect a consensus of a drug dose, a consensus of what is being used, realizing that there is clearly around the margins legitimate other people's opinion.

After usage of the drug gained acceptance as a treatment for atrial fibrillation, the American College of Cardiology, the American Heart Association, and the European Society of Cardiology formed a committee to develop guidelines for the treatment of atrial fibrillation. Dr. Prystowsky was a member of the committee. The committee's work was published and distributed by the American College of Cardiology ("ACC") in a pamphlet. Dr. Prystowsky testified that the publication represented a consensus of what is being used, but there are other legitimate opinions "around the margins." [8] Dr. Prystowsky personally prepared the ACC algorithm which was included in the publication resulting from the joint effort.[9] He was questioned about the ACC algorithm, and the relevant pages were displayed to the jury at the time of his testimony. The displayed pages were admitted, over plaintiff's objection, as Defendant's Exhibits 20, 21 and 22. They are pages 14, 15, 20 and 40 of the pamphlet. Dr. Prystowsky testified that the level of medication prescribed by Dr. Doorey was consistent with the standard of care.

### Informed Consent

Dr. Doorey testified that he explained to Mr. Berry the risks associated with the use of Amiodarone the morning after the medication was administered, although the hospital record does not reflect that conversation. His normal practice is to discuss pulmonary risks, along with other side effects associated with the use of Amiodarone. One such risk relates to the thyroid. Dr. Doorey recalls a discussion about thyroid function; and the chart reflects that certain tests were performed at that time to check thyroid function. With regard to dosages, Dr. Doorey testified,

and the record confirms, that a letter outlining future dosages was dictated in front of Mr. Berry when he met with Dr. Doorey on December 9, 2002. That letter reflects a reduction of the dosages to 200 mg twice a day, and after a month, once a day.

### DISCUSSION

Admissibility of the Algorithm

■ The first issue in plaintiffs' posttrial motion is whether the Court erred in admitting into evidence the algorithm prepared by Dr. Prystowsky. Plaintiff cites Delaware Rule of Evidence 803(18) in support of the argument that the documents admitted were in the category of a learned treatise, and as such it was error to admit the pages shown to the jury.

The plaintiff's argument is two-pronged. First, they contend that the ACC algorithm was misleading as it did not pertain to Mr. Berry due to the fact that his condition was transient and, according to the medical record, resolved spontaneously. Therefore, use of a chart designed for "Recurrent Paroxysmal or Persistent Atrial Fibrillation" is irrelevant to a patient with first onset, post-operative atrial fibrillation. Whether or not Mr. Berry's condition was within the scope of the algorithm was one of many fact questions left for the jury. Extensive testimony supported the conclusion that Mr. Berry's atrial fibrillation was recurrent.[10]

The second prong of plaintiffs' argument is that the algorithm should not have been admitted in evidence because it was a learned treatise.

Delaware Uniform Rules of Evidence 803 provides:

---

**8.** Prystowsky at 18.

**9.** Prystowsky at 24.

**10.** Doorey Direct at 64–68.

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(18) Learned Treatises. To the extent called to the attention of an exert witness upon-cross examination, or relied upon by him in direct examination, statements contained in published treatises, periodicals or pamphlets on a subject of history, medicine or other science or art, established as a reliable authority by the testimony of admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence **but may not be received as exhibits.** (emphasis supplied)

The situation in this case is unique, in that the learned treatise to which the plaintiff objects was written by the witness. The witness presented the chart in the book because it was in a usable form, and assisted the presentation of the opinions he wanted to convey to the jury. He could as easily have drawn a chart and shown the jury the decision making pathway which is outlined in the pamphlet. The chart was useful as a demonstrative tool. The defendants sought to introduce the entire pamphlet in evidence. I reviewed the pamphlet and admitted only the portion of the document that had been seen by and explained to the jury, and subjected to cross examination. The matters at issue in the case are not simple. Reducing the analysis to a flow-chart which jurors could follow, and refer to in deliberation, and accompanying the chart with the pages which explain the abbreviations in the chart and contain the data related to dosage, provided a vehicle to assist the jury in understanding the witnesses testimony. Since the algorithm

supporting the plaintiffs case was in evidence, having both documents available to the jury was, in my discretion, the better course.

The admission of algorithms has been permitted under similar circumstances where reliability has been authenticated or the algorithm has been adopted by the using practitioner. In *Frakes v. Cardiology Consultants, P.C.*[11], a medical negligence action against a cardiologist, the decedent went to the doctor for an evaluation of chest pain, was sent home after some testing, and was directed to return the next day for further testing. He died suddenly that night. At trial, a table that was included in a brochure produced by the American College of Cardiology and the American Heart Association was used to cross examine the plaintiff's expert. The expert acknowledged that he was aware of the table and that it represented a consensus statement on the interpretation of exercise treadmill tests. The same table was used in cross examination of the defendant doctor, who adopted it as a statement of the standard of practice for cardiologists. It was also presented to the defense expert witness who said it stated the standard of care. The plaintiff objected to the admission of the table as hearsay, relying on Rule 801. The court held that the table was used "to organize the expert testimony to assist the trier of fact to more easily understand a highly technical subject."[12] The appellate court concluded that the admission of the table was not error as it was used "for a legitimate purpose, [ ] its contents were extensively explored ... [and] this is not a situation where a jury is improperly exposed to unexamined hearsay."[13] See also *Hin-*

**11.** *Frakes v. Cardiology Consultants,* 1997 WL 536949 (Tenn.Ct.App.).

**12.** *Id.* at 4.

**13.** *Id.*

*licky v. Dreyfuss*[14] (algorithm, used by defendant doctor in decision making process, correctly admitted as demonstrative evidence).

Plaintiffs argue that admission of the ACC algorithm is inconsistent with the Delaware Supreme Court's ruling in *Timblin v. Kent General Hosp. (Inc.).*[15] *Timblin* was a medical negligence case. The defense presented statistical evidence concerning the percentage of patients who die or suffer brain damage following a cardiac arrest. The allegation of negligence in the case was that a twenty-five minute delay in intubating the decedent after cardiac arrest was the cause of his neurological deficit. The Court noted that in a medical negligence case the defendant may introduce evidence "to show that the applicable standard of care was met or that any departure therefrom did not cause the plaintiff's injury."[16] The Court then concluded that the proffered statistical evidence was not probative of either issue.

The ACC algorithm was relevant on the issue of standard of care, in that it provided an analytical path which demonstrated that Amiodarone was an appropriate medication, and a description of an appropriate dosage regimen. This case is readily distinguishable from *Timblin.*

### Weight of the Evidence

Plaintiffs also argue that the jury's verdict was against the weight of the evidence. A jury's verdict will be upheld unless it is against the great weight of the evidence.[17] Great deference must be given to the jury verdict in deciding a motion for a new trial that is based upon insufficient evidence.[18] The factual findings of a jury should not to be disturbed if there is any competent evidence upon which the verdict could reasonably be based.[19] The jury's verdict should not be set aside unless a reasonable jury could not have reached the result.[20]

All the plaintiffs' contentions of negligence and causation were met with counter evidence. The Defendant, and experts called by the defense, did not accept Amiodarone toxicity as the cause of death.[21] The evidence was clear that the use of Amiodarone for atrial fibrillation was appropriate. The evidence as to the appropriate dosage was contested. The plaintiffs relied primarily on the CSSM algorithm as the statement of the standard of care. The defendants provided testimony which demonstrated that since the medication had not been through the FDA approval process for atrial fibrillation there was no set dosage; that various practitioners have differing ideas, but that the consensus was as set forth in the ACC algorithm. The jury performed its function. It considered the evidence and reached a verdict which is based on competent evidence, as outlined above. I do not

**14.** *Hinlicky v. Dreyfuss,* 6 N.Y.3d 636, 815 N.Y.S.2d 908, 848 N.E.2d 1285 (2006).

**15.** *Timblin v. Kent General Hosp. (Inc.),* 640 A.2d 1021 (Del.1994).

**16.** *Id.* at 1024.

**17.** *Storey v. Camper,* 401 A.2d 458, 465 (Del. 1979).

**18.** *Young v. Frase,* 702 A.2d 1234, 1236 (Del. 1997).

**19.** *Mercedes–Benz of North America, Inc. v. Norman Gershman's Things to Wear, Inc.,* 596 A.2d 1358, 1362 (Del.1991) (citations omitted).

**20.** *Storey,* 401 A.2d at 465.

**21.** Doorey Direct at 101–103. Prystowsky at 42–43, 48–51.

find that the verdict is against the weight of the evidence.

The motion for a new trial is DENIED.