Matter of Won Yi v New York State Bd. of Professional Med. Conduct (2025 NY Slip Op 03103)

Matter of Won Yi v New York State Bd. of Professional Med. Conduct

2025 NY Slip Op 03103

Decided on May 22, 2025

Court of Appeals

Troutman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on May 22, 2025

No. 50 

[*1]In the Matter of Won Yi, Appellant,
v
New York State Board of Professional Medical Conduct, Respondent.

Anthony Z. Scher, for appellant. 
Kevin C. Hu, for respondent. 

TROUTMAN, J.

Petitioner, a board-certified physician in the field of radiation oncology, had his license to practice medicine in this State revoked as a result of a determination made by a hearing committee of the Department of Health's Board for Professional Medical Conduct.
We hold that substantial evidence supported the Board's determination to revoke petitioner's license, and the hearing committee could properly credit the testimony of the expert called by the Board. As a result, we affirm the order of the Appellate Division confirming the hearing committee's determination.
I.
Petitioner was first licensed to practice medicine in New York in 2006. He was both a board-certified radiation oncologist and a director of a private radiation oncology practice. In 2018, respondent Board for Professional Medical Conduct—the entity charged with investigating and prosecuting misconduct by medical professionals—charged petitioner with 17 specifications of professional misconduct, including practicing medicine with gross negligence, gross incompetence, negligence on more than one occasion, and incompetence on more than one occasion. These charges stemmed from petitioner's treatment of seven patients from 2009 and 2013. Petitioner answered the charges and denied the specifications.
A hearing committee of the Board—which is responsible for adjudicating misconduct claims—held a nine-day administrative hearing at which the Board called an expert witness licensed to practice medicine in New York for [*2]nearly 30 years and certified in radiation oncology through the American Board of Radiology. The Board's expert testified about the standard of care for radiation oncologists. As part of that testimony, the Board's expert stated that radiation oncologists typically look to guidelines provided by the National Comprehensive Cancer Network (NCCN) and the American College of Radiology (ACR) when determining the dosage of radiation to administer to patients. He described the guidelines as "one window into which one could look" to determine what should be done for a patient with metastatic disease. An "alternate" way to proceed, according to the expert, is to consult "textbooks" referencing "historic clinical data that has been proven . . . in clinical trials." These texts provide "guidelines or past practice patterns" that a radiation oncologist can use to help establish the dosage of radiation at which, for a particular patient, the therapeutic benefit will outweigh the potential harm.
With respect to the patients at issue, the Board's expert testified that petitioner deviated from the generally accepted standard of care by, among other things, providing excessive radiation to numerous patients; administering higher, "curative" doses of radiation treatment when lower, "palliative" doses were appropriate; and failing to account for prior radiation treatment when delivering radiation to patients. On cross examination, petitioner repeatedly pressed the Board's expert to explain what he meant by "standard of care." Among other things, the expert explained that when a radiation oncologist deviates from previously discussed guidelines "it is considered to fall short of a standard."
Petitioner testified at the hearing. He also produced his own expert who testified in petitioner's defense.
The hearing committee sustained the majority of specifications against petitioner and revoked his license. Petitioner commenced this article 78 proceeding challenging the hearing committee's determination. His petition included contentions that clinical practice guidelines issued by professional societies do not determine the standard of care and that the hearing committee's determination was not supported by substantial evidence.
The Appellate Division confirmed the hearing committee's determination, stating that the relevant "guidelines provide contemporary informed treatment recommendations that are flexible and subject to adjustment—but do not purport to define an authoritative standard of care" (226 AD3d 1167, 1170 [2024]). The Court reasoned that—the "express identification of these guidelines as the standard of care" by the Board's expert, notwithstanding—"it is evident from [the expert's] detailed testimony as to each patient that he utilized the guidelines as 'one link in the chain' of his evaluation process" and "he provided a factual basis for his opinions as to both negligence and incompetence going far beyond a mere recitation of the guidelines" (id.). Consequently, the Appellate Division concluded that the Board's expert "provided competent expert testimony that the Hearing Committee could rely on in its determinations" (id. at 1171). Additionally, the Appellate Division took judicial notice of the practice guidelines that were not included in the record (see id. at 1169).
Two justices dissented. They would have held that the testimony of the Board's expert failed to provide substantial evidence supporting the hearing committee's determination. Specifically, the dissent asserted that the expert's testimony was "premised upon professional practice materials intended to be used only as educational tools and which, by express disclaimer, are designed to be merely advisory in nature" (see id. at 1176).
Petitioner appealed to this Court as of right based on the two-Justice dissent (see CPLR 5601 [a]). We now affirm.
II.
It is well established that we must uphold determinations of professional misconduct if they are supported by substantial evidence (see Matter of Block v Ambach, 73 NY2d 323, 335 [1989]). Substantial evidence is "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1046 [2018] [internal quotation marks omitted]). It is a "minimal standard" that "demands only that a given inference is reasonable and plausible, not necessarily the most probable" (id. at 1045-1046). Under this standard, "the assessment and resolution of conflicting evidence and witness credibility are within the exclusive province of the Hearing Committee" and are generally not subject to judicial review (Matter of Patin v State Bd. for Professional Med. Conduct, 77 AD3d 1211, 1212 [3d Dept 2010] [internal quotation marks omitted]).
Petitioner contends, however, that a substantial evidentiary basis is lacking because the hearing committee erroneously understood professional societies to establish the accepted standard of care. Petitioner's argument is unpersuasive because, as the Appellate Division concluded, the Board's expert did not rely solely on clinical practice guidelines to establish the standard of care accepted in the field of radiation oncology. The expert relied, instead, on his understanding of the standard of care as informed by those guidelines. Petitioner's arguments to the contrary [*3]misstate our precedents and mischaracterize both the Appellate Division's decision and the testimony of the Board's expert.
Generally, "the standard of care for a physician is one established by the profession itself" (Spensieri v Lasky, 94 NY2d 231, 238 [1999]). Recommendations made in clinical practice guidelines issued by professional organizations do not alone determine the standard of care (see Diaz v New York Downtown Hospital, 99 NY2d 542, 545 [2002]). Nevertheless, an expert witness may rely on those guidelines in evaluating a doctor's conduct (see Spensieri, 94 NY2d at 239). Consequently, clinical practice guidelines—though not determinative—may "assist in establishing the relevant standard of care" (Leberman on Behalf of Miller v Glick, 207 AD3d 1203, 1205 [4th Dept 2022]; see Hinlicky v Dreyfuss, 6 NY3d 636, 646-647 [2006]).
Petitioner's contention that the Board's expert relied solely on clinical practice guidelines overvalues the import of the following testimony:
Counsel: "[W]hat do you mean when you say standard of care?
Expert: "We have accepted guidelines that are published by multiple societies, they include our board, [the] American College of Radiology or [the] American Board of Radiology, [and] national comprehensive cancer networks and these are fairly descriptive, prescriptive guidelines for what a physician should do in the management of cases in very specific areas. When you deviate from those, it is considered to fall short of a standard."
This answer by the Board's expert, and others like it, should not be viewed in isolation. The Board's expert was well-credentialed and had over 30 years of practice in the field of radiation oncology. Rather than merely citing the clinical practice guidelines as being the standard of care, he established the standard of care as he understood it based on his years of seeing patients. For each of the seven patients at issue, the Board's expert identified the relevant medical and scientific principles underlying the standard of care and provided detailed explanations about why that standard best served patients and why deviating from it risked causing significant harm to those patients. Thus, respondent's expert did not rely exclusively on clinical practice guidelines. Instead, as the Appellate Division concluded, he used those guidelines as "one link in the chain" of his evaluation process (id. at 1170 [internal quotation marks omitted], quoting Hinlicky, 6 NY3d at 647).
Reviewing the answers given by the Board's expert in the context of his overall testimony, we conclude that the expert did not negate, as a matter of law, his testimony about the numerous bases for his opinion that petitioner violated the standard of care. Consequently, it was within the hearing committee's province to evaluate the import and credibility of that testimony (see Matter of Mandelstam v McDonald, 229 AD3d 912, 915-916 [3d Dept 2024]).
III.
Contrary to petitioner's arguments, it is irrelevant that the guidelines on which the Board's expert relied were not in evidence. It is well settled that an expert is entitled to rely on materials not in evidence if they are "of a kind accepted in the profession as reliable in forming a professional opinion" (Hambsch v New York City Tr. Auth., 63 NY2d 723, 726 [1984]).
The Appellate Division's decision to take judicial notice of those guidelines does not require reversal. "[J]udicial notice comes in the place of proof" (Wood v Northwestern Ins. Co., 46 NY 421, 426 [1871]). In taking notice, courts must be cautious, lest they deviate from the foundational principle that "a judge should not decide an issue upon personal knowledge of facts outside the record or upon information received upon personal investigation" (Central Hanover Bank & Tr. Co. v Eisner, 276 NY 121, 125 [1937]). Facts that are neither "inevitable nor a matter of general and public notoriety" are generally not fit for judicial notice (Wood, 46 NY at 427). Nevertheless, to the extent the Appellate Division erred in taking judicial notice in this case, the error was harmless because the "evidence in the record amply supports the determination . . . " (Matter of Abdella v Scribner, 31 NY2d 940, 942 [1972]).
We have reviewed petitioner's remaining contentions and find them to be without merit. Accordingly, the judgment of the Appellate Division should be affirmed, with costs.
Judgment affirmed, with costs. Opinion by Judge Troutman. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro and Halligan concur.
Decided May 22, 2025